B. HEINEMANN LUMBER COMPANY, Respondent, vs. WILLIAMS, Appellant.

*February 8—March 9, 1926.*

*Sales: Buyer refusing to accept delivery: Disposition of goods on seller's account: Compromise and settlement.*

1. Telegrams passing between a buyer of a carload of flooring, who refused to accept delivery, and the seller relative to its disposal subject to the seller's order, and the expression of a belief by the buyer that he could sell it to local users without loss to the seller, are construed not to constitute an agreement to dispose of the flooring so as to make the seller whole. p. 338.

2. A telegram to the buyer suggesting that, to save expense, he store the flooring, and the answer of the buyer that he was willing to arrange for its disposal, subject to the order of the seller but at no expense to the buyer, which was followed by a wire from the seller to handle promptly, constitutes an agreement of compromise and settlement. p. 339.

3. Irrespective of the merits of the original controversy between the parties, the telegrams concerning the disposition of the lumber are *held* to constitute an agreement of compromise and settlement. p. 339.

APPEAL from a judgment of the circuit court for Marathon county: A. H. REID, Circuit Judge. *Reversed.*

For the appellant the cause was submitted on the brief of *Bird, Okoneski & Puchner* of Wausau.

For the respondent there was a brief by *Brown, Pradt & Genrich* of Wausau, and oral argument by *L. A. Pradt, Jr.*

Owen, J.   This action was brought to recover for a carload of maple factory flooring, delivered by plaintiff to the defendant on track at Holliston, Massachusetts, which the defendant refused to accept because not delivered in time and because the flooring was matched instead of straight edged.   The car arrived at its destination March 31, 1922, and upon the refusal of the defendant to accept the same much correspondence ensued, which appellant contends resulted in a settlement and compromise of the differences existing between the parties.   The circuit court first considered and construed the contract of sale, holding that the plaintiff complied with the contract and that it was the duty of the defendant to receive and pay for the flooring.   Having arrived at this conclusion, the court considered it unnecessary to determine whether any agreement of settlement was arrived at subsequent to the arrival of the lumber at Holliston, Massachusetts, although the opinion was expressed that the correspondence upon which the defendant relies did not constitute a compromise agreement.   In our view of the case, the merits of the original controversy between the parties are quite immaterial if, as a matter of fact, there was a subsequent agreement of settlement or compromise, and we shall first consider that question.

After this lumber had laid on the track accumulating demurrage charges for thirty days, the plaintiff on May 1st wired defendant as follows: "Would it not be better to save expense for whom it might finally fall upon, and without either of us waiving any of our rights, for you to arrange for the immediate unloading and proper care of contents. Wire."   To this defendant made no reply, and on May 3d plaintiff again wired: "No answer to our wire May 1st. What have you decided to do?"   In reply to this, on May 4th defendant wired plaintiff as follows: "Replying night letter, we are willing to take in flooring and arrange disposal

subject your order or by sales at not less than your invoice but without cost to us. Believe we can sell to local users without loss to you. Advise by wire." In response to this, plaintiff on May 5th wired defendant: "Please handle promptly to save further expense per your wire." On May 6th defendant wired plaintiff requesting $500 to cover freight and demurrage charges. On May 8th plaintiff wrote defendant, inclosing its check for $500, and saying:

"As outlined in our telegram, will you please have unloaded at once, to save further expense, and put in proper dry place so that material will not depreciate. I am hoping then that you will arrange for the sale of this material so that there will not be any loss to us, and I am sure that you appreciate that we are entirely blameless in the matter. It is questionable as to where the responsibility would lie, but nothing can be gained either for you or for us in having this matter in controversy, so we have accepted your proposition, and I am hoping that you will put every effort to save us as much as possible, and if possible work us out of this very unpleasant situation without any loss. May we hope to hear from you by early mail indicating just what the present status is and what the prospects of an early sale are."

Pursuant to this letter defendant unloaded and stored the lumber. On May 13th defendant wrote plaintiff acknowledging the receipt of the check for $500 and saying:

"When we looked into this car of lumber on the siding, it seemed to bear out our general understanding as to what the goods were to be except that they were not straight edge. Therefore in unloading we are not quite satisfied that we can get anywhere near what we anticipated in sales to local consumers. There is a great deal of the stock in short lengths. . . . We took in this flooring though we were crowded for space and are sending loads of goods away for outside storage. However, we want to help you out of the matter as we realize just what it means to you, but after showing the stock to local builders we are not as optimistic about disposal at this time."

It should be stated here that the defendant placed this order in response to a quotation from R. A. Swift, a broker of Boston. In his letter of quotation Mr. Swift stated that

"This stock would be manufactured by one of the largest flooring manufacturers in Michigan, and is the very best make of flooring that can be obtained in the country. We could make immediate shipment of the above items, and we quote subject to prior sale and prompt acceptance. We would like to call your attention especially to the $3\frac{1}{4}''$ factory flooring which is a special item. This is $1\frac{1}{2}'$ and longer with 10 % under 4'. As you doubtless know, these are unusually good lengths for factory grade. This stock was originally put up for a customer, and later the specifications were changed to the No. 1 grade. This flooring is manufactured strictly in accordance with the Maple Flooring Manufacturers Association rules."

This explains the reason why the defendant was disappointed in discovering the high percentage of short lengths upon unloading the lumber. It is undisputed that the lumber unloaded did not come up to the specifications contained in Mr. Swift's letter, and that it was not as marketable as it would have been had it conformed to those specifications. It is therefore plain to be seen that when the defendant sent the telegram of May 6th offering to take in the flooring and arranging for its disposal he had in mind one grade of flooring, while upon unloading he discovered quite another. Upon receipt of the letter of May 13th plaintiff immediately stopped payment of the $500 check, wrote defendant charging bad faith, and claiming that "by the terms of your telegram of May 4th we were assured the amount of our invoice, to wit, $787.50, less the freight charges. Now, in your letter of the 13th, you attempt again to reopen the whole situation by arguing with us about the original order and quality of the flooring, which has nothing to do with

B. Heinemann Lumber Co. v. Williams, 189' Wis. 333.

the matter whatsoever at this time." To this letter de-
fendant replied:

"In taking in this lumber for you we thought we were
rendering you some friendly assistance. Please remember
we asked for no money consideration, and your claim that
we have made a new contract through our night letter to
sell your flooring at more than its worth is quite absurd.
We do not think you have the right sense of honor in either
repudiating the payment of your check or placing any other
construction on the night letter sent you than a reasonable
one. Please take notice that from May 12th we shall charge
storage at the rate of $5 per day on the lumber here and we
assume no responsibility whatever as to fire risk. As for
your protested check, we shall place the same for collec-
tion."

We take it that the legal effect of this correspondence is
a question of law. It is certain that this correspondence
did constitute some sort of an agreement between the
parties, and a consideration thereof should disclose what
that agreement was. The telegram of May 1st sent by
plaintiff to the defendant merely suggests an arrangement
by which further expense in the way of demurrage charges
might be avoided without the waiver of any rights on the
part of either party. However, the telegram of May 4th
from the defendant to the plaintiff is more definite, and
states just what the defendant is willing to do:

"We are willing to take in flooring and arrange disposal
subject your order or by sales at not less than your invoice
but without cost to us. Believe we can sell to local users
without loss to you. Advise by wire."

There are a number of matters concerning which the tenor
of this telegram could leave no doubt. In the first place, the
defendant repudiated any title to the lumber. Its disposal
would be subject to plaintiff's order. In the second place,

the defendant refused to assume any expense in the matter. In the third place, a mere opinion is expressed that the lumber can be disposed of to local users without loss to the plaintiff. We can see no undertaking or agreement on the part of the defendant to dispose of this lumber so as to make the plaintiff whole. The proposition was to "arrange disposal subject to your order," or, as we think we can, "by sales at not less than your invoice." If this telegram assured plaintiff the amount of its invoice for its lumber, as claimed by it in its letter of May 16th, it is apparent that the defendant might as well have paid for the lumber outright. But that defendant intended no such thing is very definitely indicated by his telegram, making clear that he would assume no cost in the matter, that he would hold the lumber subject to plaintiff's order, and that he believed he could sell the lumber to local users at the invoice price. If defendant undertook to secure plaintiff the invoice price, there was little point in calling upon the plaintiff for a $500 check to cover freight and demurrage, and there was just as little occasion for compliance on the part of the plaintiff with this request. That this was not the understanding of the plaintiff is plainly indicated by a perusal of its letter of May 8th wherein it was said:

"I am hoping that you will arrange for the sale of this material so that there will not be any loss to us, and I am sure that you appreciate that we are entirely blameless in the matter, . . . and I am hoping that you will put every effort to save us as much as possible, and if possible work us out of this very unpleasant situation without any loss."

The situation was this: Plaintiff had a carload of lumber on the tracks of Holliston, Massachusetts. Defendant refused to accept or pay for the lumber. There was no doubt a *bona fide* controversy between the parties as to whether the defendant was liable for the lumber. Litigation was bound to be expensive. It was quite likely to consume the

entire value of the lumber. The defendant offered to take the lumber in, hold it subject to plaintiff's order, and, with his then understanding of the grade of lumber, expressed the belief that he could sell it for the invoice price to local consumers. Plaintiff accepted the proposition. Defendant unloaded the lumber and, upon discovering its true grade, expressed doubt as to whether it could be sold to local users at its invoice price. Plaintiff then sought to put an unwarranted construction on defendant's offer, stopped payment on the check which it had sent to cover freight and demurrage charges, and then brought this action to recover the value of the lumber.

We have no difficulty in arriving at the conclusion that, whatever the merits of the original controversy between the parties, the telegrams we have been considering constituted an agreement of compromise and settlement, and that the judgment of the lower court which awards the plaintiff the value of the lumber is erroneous and must be reversed.

In his answer the defendant denied liability and set up a number of counterclaims for the value of storage of the lumber, the cost and expense of unloading the same, the freight and demurrage charges paid, and for certain sums recovered in garnishee proceedings. In view of the decision of the lower court, of course defendant could not recover on these counterclaims, and the court made no findings with reference thereto. In view of our conclusion it will be necessary for the trial court to pass on these counterclaims.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings in accordance with this opinion.